Dated: April 15, 2009

_____
**RANDOLPH J. HAINES**
**U.S. Bankruptcy Judge**
_____

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>GLOBAL GROUNDS GREENERY, LLC, et al.<br><br>         Debtor.<br>_____<br>MORRIS C. AARON, Chapter 11 Liquidating Trustee,<br>         Plaintiff,<br><br>   vs.<br><br>ROBERT J. ROSEPINK; ROBERT J. ROSEPINK, P.C.; ROSEPINK & ESTES, PLLC; and SUSAN T. ROSEPINK, individually and as TRUSTEE of the ADAM TAYLOR ROSEPINK 1982 TRUST,<br><br>         Defendants.<br>_____ | Chapter 11<br><br>Case No. 2:06-bk-01701-RJH<br>Case No. 2:06-bk-01702-RJH<br>Case No. 2:06-bk-01718-RJH<br>Case No. 2:06-bk-01741-RJH<br>Case No. 2:06-bk-01743-RJH<br>Case No. 2:06-bk-01744-RJH<br>Case No. 2:06-bk-01758-RJH<br><br>(Jointly Administered)<br><br><br>ADVERSARY NO. 2:08-ap-00278-RJH<br><br>OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON FRAUDULENT TRANSFER CAUSE OF ACTION |

   The issue here is whether an equity receiver of a corporate entity may assert fraudulent transfer causes of action that are assertable by creditors of the receivership entity without any such specific authority in the order appointing the receiver, or assignments of those causes of action by creditors. The Court concludes the receiver may not assert such causes of action.

**Factual Background**

   The Debtors in these jointly administered bankruptcy cases are all alleged to be

corporate entities formed by William Galyon to operate a Ponzi scheme.[1] Galyon and his entities allegedly raised approximately $47 million from about 95 investors for the purpose of financing concerts and other entertainment events, the proceeds of which would be used to pay the investors interest up to 20% per year. In fact, however, it is alleged that very few concerts were ever held, and those investors who were repaid principal or interest were paid from the proceeds of subsequent investors.

Some investors initiated litigation in state court, which appointed Peter S. Davis as Receiver of all of the entities involved in the Ponzi scheme.

Although Mr. Galyon and his corporate entities initially acquiesced in the appointment of a receiver, a little over a month later they filed Chapter 11 petitions and sought turnover by the Receiver pursuant to Bankruptcy Code § 543.[2] They also sought to employ a Chief Restructuring Officer to whom the turnover would be made instead of to Mr. Galyon. After evidentiary hearing, this Court excused turnover by the Receiver pursuant to Bankruptcy Code § 543(d)(1), but simultaneously ordered that Receiver Davis be designated as the representative of the Debtors' estates pursuant to Bankruptcy Rule 9001(5) and that he have all the rights, powers and obligations of a debtor in possession pursuant to Bankruptcy Code § 1107(a). One of the express reasons for this ruling was because a receiver without the powers of a debtor in possession may not be able to assert preference and fraudulent transfer causes of action, but a debtor in possession who is also a receiver may not be subject to the defense of *in pari delicto*.

---

[1] "A Ponzi scheme is a financial fraud that induces investment by promising extremely high, risk-free returns, usually in a short time period, from an allegedly legitimate business venture. 'The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment.'" *Donell v. Kowell*, 533 F.3d 762, 767 n.2 (9th Cir. 2008), quoting *In re United Energy Corp.,* 944 F.2d 589, 590 n.1 (9th Cir.1991). *See generally Cunningham v. Brown,* 265 U.S. 1 (1924) (detailing the remarkable criminal financial career of Charles Ponzi).

[2] Except as otherwise indicated, all references to the Bankruptcy Code are to 11 U.S.C. §§ 101 *et seq.*

Approximately five months later Receiver Davis filed this lawsuit in state court against Robert Rosepink and his professional corporation. Davis' suit alleged that Rosepink brought investors into the Galyon Ponzi scheme and was paid approximately $1 million in commissions for doing so. Rosepink is a lawyer and he received more than $100,000 of the commissions for bringing his own clients into the scheme. In addition, Rosepink had invested and been repaid $200,000 together with a $12,000 profit from the Ponzi scheme. Although the complaint asserts many causes of action, the first count seeks recovery of the commissions, the profits and the return of principal as both actual and constructive fraudulent transfers under Arizona's version of the Uniform Fraudulent Transfer Act.[3] The Receiver's complaint does not allege that Receiver Davis is a creditor of the transferor entities, does not assert the fraudulent transfer action under Bankruptcy Code §§ 544 or 548, and does not assert any of the Receiver's rights and powers as a debtor in possession pursuant to this Court's Order of July, 2006.

Disputes over who should act as receiver were resolved when this Court confirmed a liquidating plan of reorganization. Among other things, the confirmed plan named Morris Aaron as Liquidating Trustee, and in that capacity he replaced Peter Davis as Receiver in the still pending state court litigation. Following confirmation of the Plan, Liquidating Trustee Aaron was substituted as Plaintiff in the pending *Davis v. Rosepink* lawsuit, and he then removed it to Bankruptcy Court. No one objected to the timeliness of the removal nor has any motion to remand been filed.

**The Motions for Summary Judgment**

Liquidating Trustee Aaron moved for summary judgment on Count I of the complaint. The motion argues that Galyon's businesses had previously been determined to constitute a Ponzi scheme, and that transfers to "net winners" pursuant to a Ponzi scheme are both actually and constructively fraudulent under *Donell*.[4]

---

[3] A.R.S. § 44-1001 *et seq.*

[4] *Donell v. Kowell*, 533 F.3d 762, 770-71 (9th Cir. 2008).

Case 2:08-ap-00278-RJH   Doc 26   Filed 04/15/09   Entered 04/16/09 11:50:18   Desc
Main Document    Page 3 of 14

Rosepink responded to the motion and cross moved on several grounds. In addition to asserting the defense of *in pari delicto*, Rosepink's cross motion asserts that as a receiver, Aaron and Davis are not entitled to assert the rights of creditors, but rather merely stand in the shoes of the Debtors, the Ponzi perpetrators, who cannot avoid their own transfers as fraudulent transfers.

**Analysis**

There is no dispute that the Uniform Fraudulent Transfer Act, as adopted in Arizona and elsewhere, only creates causes of action for creditors of the transferor. The Uniform Fraudulent Transfer Act defines certain transactions to be "fraudulent as to a creditor,"[5] and then provides that "a creditor" may obtain certain remedies against a transfer deemed fraudulent.[6] Nothing in the substantive law provides any remedies for receivers. So the question is whether an Arizona equity receiver can assert the rights of a creditor under the Fraudulent Transfer Act.

**Arizona Statutes Do Not Vest Creditor Causes of Action in Creditor Representatives.**

Arizona law provides that the superior court "may appoint a receiver to protect and preserve property or the rights of parties therein, even if the action includes no other claim for relief."[7] Rule 66 of the Arizona Rules of Civil Procedure governs the procedure for appointment of receivers. Rule 66(c)(1) provides that "the receiver may, subject to control of the court, commence and defend actions," and Rule 66(c)(4) provides: "In all matters relating to the appointment of receivers, to their powers, duties and liabilities, and to the power of the court, the principles of equity shall govern when applicable." Thus neither the statute nor the rule expressly vests creditor causes of action in a receiver.

In determining whether the legislature intended to vest receivers with creditor causes of action it is instructive to compare the statutory rights and powers of a receiver with

---

[5] A.R.S. § 44-1004(A) and 44-1005 (UFTA §§ 4 and 5 respectively).

[6] A.R.S. § 44-1007(A) (UFTA § 7).

[7] A.R.S. § 12-1241.

4

those of an analogous assignee for benefit of creditors. Arizona law completely abolished the common law of assignments of benefits of creditors and replaced it with statutory authority.[8] The statutes governing assignments for benefit of creditors do not vest in the assignee the fraudulent transfer actions that could be asserted by creditors, which are defined in the immediately preceding Article of Title 44. The assignment for benefit of creditor statutes do create a special kind of fraudulent transfer action for the assignee, but it is apparently the assignee's own cause of action rather than a vesting of a creditor's cause of action, and it is not the identical to a creditor's fraudulent transfer cause of action. Not only is the assignee's cause of action limited to actual rather than constructive fraudulent transfers, but it is also limited to transfers made "in contemplation of the assignment" for the benefit of creditors.[9]

The legislature's careful definition of the nature of the fraudulent transfer action assertable by an assignee for benefit of creditors suggests that if the legislature had intended receivers to have similar causes of action, either of their own unique variety or simply a vesting of creditors' causes of action, the legislature would have expressly said so.

**Receivership Order Does Not Vest Creditor Actions In the Receiver.**

The order appointing the receiver, entered in May, 2006, does not expressly vest in the Receiver any creditors' claims. Instead, the order merely grants the Receiver authority to recover and preserve the assets of the Receivership Defendants. It defines "Receivership Assets" to be "all of the property owned by, controlled by, or in the name of any of the Receivership Defendants." That definition obviously does not include any money that had previously been transferred to and is currently owned by an investor, a fraudulent transferee or a commission agent such as Rosepink. The order also requires the Receiver to "take exclusive custody, control and possession of all Receivership Assets," and to "conserve, hold and manage all assets of the

---

[8] A.R.S. § 44-1031(C) ("Assignments for the benefit of creditors under the common law are declared contrary to the public policy of the state and are abolished, and all assignments for the benefit of creditors are void and of no force and effect unless made in accordance with the provisions of this article.").

[9] A.R.S. § 44-1041.

5

Receivership Defendants, and perform all acts necessary or advisable to preserve the value of those assets in order to prevent any irreparable loss, damage or injury to consumers or creditors of the Receivership Defendants . . . ." The Receiver is authorized to institute such litigation "that the Receiver deems necessary and advisable to preserve or recover the assets of the Receivership Defendants." None of this language suggests creditor avoidance actions were intended to be vested in the Receiver.

Moreover, although the receivership order includes a broad stay of litigation, it only stays "any action to establish or enforce any claim, right, or interest for, against, on behalf of, in, or in the name of, any of the Receivership Defendants . . . ." That stay would not preclude a creditor of the Galyon entities from bringing a fraudulent conveyance action against any transferee of the Galyon entities, because such action would not assert any claim against, on behalf of or in the name of any of the Galyon entitites. This failure to stay creditor fraudulent transfer actions suggests there was no intent to vest such actions in the Receiver. Absent such a stay, creditor actions could compete with the Receiver's actions to recover fraudulent transfers. And a creditor could conceivably recover on his own fraudulent transfer action and yet also claim a *pro rata* share of the proceeds of the Receiver's fraudulent transfer actions, effectively rewarding a creditor with a double recovery even though his own action may have threatened the Receiver's recovery.

In fact, to avoid just that potential for a multiple liability, Rosepink moved in state court to dismiss any counts of the complaint that sought to assert claims on behalf of creditors and investors. The Receiver responded that he was not suing on behalf of creditors or investors but rather only "seeks damages the Receivership Entities suffered." Rosepink's motion to dismiss claims asserted on behalf of creditors was apparently denied on the basis of the Receiver's response that he was asserting only the Receiver's claims. Rosepink argues that the Receiver is now judicially estopped to assert creditor causes of action such as the fraudulent transfer actions asserted in Count I.

In short, creditor causes of action were not vested in the Receiver by virtue of the

6

Case 2:08-ap-00278-RJH    Doc 26    Filed 04/15/09    Entered 04/16/09 11:50:18    Desc
Main Document    Page 6 of 14

receivership order.

**The Receiver Cites No Authority Holding that Receivers Generally Are Vested with Creditor Causes of Action.**

In response to Rosepink's cross motion for summary judgment the Receiver does not cite any case holding that receivers generally may assert creditor causes of action. The authority the Receiver most heavily relies on is the Seventh Circuit's opinion in *Scholes v. Lehmann*.[10] Like this case, *Scholes* was a receiver for corporations involved in a Ponzi scheme who filed fraudulent transfer actions against the principal's ex-wife, a "net winner" investor, and some religious institutions that received charitable contributions. Among other defenses, the defendants argued that the receiver did not have standing to assert the creditors' causes of action for fraudulent transfer. In rejecting that argument, the opinion did not conclude that the receiver held the creditors' causes of action. Rather, the opinion concluded the cause of action could be asserted on behalf of the corporations themselves, because the transfers were *ultra vires* and therefore damaging to the corporation: "The three sets of transfers removed assets from the corporations for an unauthorized purpose and by doing so injured the corporations."[11] The opinion then went on to conclude that although the corporation would ordinarily be barred by the defense of *in pari delicto*, that defense "losses its sting when the person who is *in pari delicto* is eliminated" and replaced by a trustee.[12] Thus what *Scholes* upheld was really a corporate law action for waste or *ultra vires* transactions although they were couched as fraudulent transfer actions. That it really was such a corporate law cause of action rather than a vesting of creditors' fraudulent transfer actions in the receiver was made explicitly clear by the Seventh Circuit's acknowledgment that "we can find no cases in which a receiver for a sole proprietorship recovered a fraudulent conveyance."[13]

---

[10]*Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995).

[11]*Id.* at 754.

[12]*Id.*

[13]*Id.* at 755.

7

Thus for the present case *Scholes* does not stand for the proposition that a receiver may assert creditors' fraudulent transfer actions. And to the extent the Receiver here could recover the challenged transfers in the right of the defendant corporations themselves because they were *ultra vires*, those causes of action may be among some of the other 13 causes of action the receiver has asserted against the Rosepink defendants. Such an action, however, is not plead in count 1, which is solely an action to recover an actual or constructive fraudulent transfer, a cause of action that is only assertable by creditors, not by the transferor.

The receiver also relies on the Ninth Circuit's opinion in *O'Melveny & Myers* after remand by the Supreme Court.[14] That case, however, has nothing to do with fraudulent transfers or receivers' standing to assert them. The underlying cause of action in *O'Melveny* was legal malpractice,[15] a cause of action that obviously belongs to the client itself and hence to its receiver, not to its creditors. The issue was not the receiver's standing to bring the cause of action, but rather whether the defense of *in pari delicto* was assertable against the receiver. While Rosepink's defense of *in pari delicto* similarly may not be assertable against the Receiver here, the *O'Melveny* opinion has no bearing on whether the Receiver has a fraudulent transfer action to assert.

**Arizona Case Law Relies On Clark and Equitable Principles**.

No Arizona case law establishes that receivers are vested with creditor causes of action. In one case, however, the Arizona Court of Appeals noted that "Arizona's territorial legislature codified the equitable receiver doctrine,"[16] which authorized the appointment of a receiver in three circumstances: (1) as a provisional, prejudgment remedy when a party has established a *prima facia* right to the property in possession of the adverse party; (2) after

---

[14] *FDIC v. O'Melveny & Myers*, 61 F.3d 17 (9th Cir. 1995).

[15] *FDIC v. O'Melveny & Myers*, 969 F.2d 744, 746 (9th Cir. 1992), *rev'd on other grounds*, 512 U.S. 79 (1994).

[16] *First Phoenix Realty Investments v. Superior Court*, 173 Ariz. 265, 267, 841 P.2d 1390, 1392 (App. Div. 1 1992).

8

judgment, to dispose of property according to the judgment or to preserve it pending appeal; and (3) "in such other cases as are in accordance with the practice of courts of equity jurisdiction."[17] Although the Arizona statute governing the appointment of receivers has since been amended to eliminate the pending action requirement, this case law suggests that Arizona law adopted general equitable principles as to the power and authority of receivers.

The leading authority on receivers, as recognized by the Court of Appeals in *First Phoenix Realty*, was Ralph Ewing Clark, author of CLARK ON RECEIVERS. Clark's treatise states that receivers' powers derive from five possible sources:

> First: Those powers and duties directly stated in the order of court appointing the receiver and such subsequent powers and duties as may from time to time be given.
>
> Second: Those powers and duties clearly implied from the order or orders of court appointing the receiver and which are clearly and reasonably necessary to the carrying out of such order or orders.
>
> Third: Such powers as are given to the receiver by applicable provisions of federal or state statutes.
>
> Fourth: Those powers which a long line of decisions and a uniform course of practice in the courts of chancery, both in this country and in England have pointed out and defined with some accuracy.
>
> Fifth: A receiver appointed by the court may have certain statutory duties to perform which follow his control, possession and operation of the defendant's property.[18]

Because here there is no authority to assert creditor causes of action granted by the Arizona statute or by the order appointing the Receiver, then it must derive, if at all, from the "long line of decisions and a uniform course of practice in the courts of chancery" and "defined with some accuracy."

Clark then states that "as a general rule of law, a receiver possesses no rights with respect to the property in his possession superior to those which would be possessed by the

---

[17] *Id.* n.1.

[18] 2 RALPH EWING CLARK, A TREATISE ON THE LAW AND PRACTICE AND RECEIVERS § 355 at 610-11 (3d ed. 1959) (hereafter "Clark on Receivers").

9

defendant individual or corporation whose property was thrown into the hands of the court."[19]
Thus "the general rule is well established that a receiver takes control and possession of the
property of the corporation or individual whose receiver he is and that any defense which would
have been good against the former may be asserted against the latter."[20]

In specifically addressing the power of a receiver to set aside the debtor's
fraudulent transfers, Clark notes that a receiver in supplementary proceedings "acquires no right
by succession to the rights of the debtor to the property fraudulently transferred for the reason
that the transfer is valid against the debtor and cannot be set aside by the receiver as the debtor's
successor."[21] In an equity receivership context, however, Clark cites cases from New Jersey and
Ohio where receivers were permitted to set aside unrecorded mortgages that the debtor itself
could not have avoided,[22] essentially equivalent to the Bankruptcy Code's "strong arm clause,"[23]
although he also notes a Minnesota case to the contrary.[24] Clark also cites two 1934 Supreme
Court decisions for the proposition that the receiver of an insolvent corporation may avoid
fraudulent transfer actions even though the corporation itself was not in a position to do so.[25]
But in both of those cases the transfers were made by insolvent banks in violation of the National
Bank Act of 1864 that was intended to ensure uniformity in the treatment of depositors and a
ratable distribution of assets. Those decisions were direct lineal ancestors of the *D'Oench,*

---

[19] *Id.* § 362, at 619.

[20] *Id.*

[21] *Id.* § 364, at 621.

[22] *Id.* at 622, nn. 67-69.

[23] Bankruptcy Code § 544(a), added to the Bankruptcy Act as § 70c in 1910. *See* 4B COLLIER ON BANKRUPTCY ¶ 70.47 (14th ed. 1978).

[24] CLARK ON RECEIVERS, *supra*, § 364, at 622 n.70, citing *Munck v. Security State Bank*, 175 Minn. 47, 220 NW 400 (1928).

[25] *Texas & Pac. Ry. Co. v. Pottorff*, 291 U.S. 245, 255 (1934); *accord, Marion v. Sneeden*, 291 U.S. 262 (1934), cited in CLARK ON RECEIVERS, *supra*, n.71.

10

*Duhme*[26] doctrine that was subsequently codified in the Federal Deposit Insurance Act of 1950,[27] which defines a power so unique to bank receivers that it cannot be taken as representative of the powers of equity receivers. Indeed, to the contrary, the uniqueness of the *D'Oench, Duhme* doctrine suggests such powers were not recognized to be assertable by equity receivers generally.

Clark's recitation of two jurisdictions that permitted receivers to avoid unrecorded mortgages, and one jurisdiction that did not, can hardly be deemed to qualify as a receiver's source of authority derived from "a long line of decisions and a uniform course of practice in the courts of chancery . . . and defined with some accuracy."

While the leading authority on receivers might have been somewhat equivocal as to a receiver's general authority to assert fraudulent transfer actions, the last century's leading authority on fraudulent transfers and creditors' rights generally was not so equivocal. In 1915, Garrard Glenn wrote: "So the question is, can the chancery court clothe its receiver with such powers" to avoid fraudulent transfers? "On principle, this question must be answered in the negative."[28] He explains that because the statute of fraudulent conveyance "never was intended as anything but an aid to the enforcement of a judgment already obtained," a prejudgment equity receiver is powerless to act.[29] He then notes that the cases that appear to recognize such a power all fall into one of four categories, none of which is applicable here: (1) where there is statutory authority for the receiver to act for creditors; (2) where the act was *ultra vires* and not binding on

---

[26]*D'Oench, Duhme & Co. v. FDIC*, 315 US 447 (1942). *D'Oench, Duhme* relied heavily on *Deitrich v. Greaney*, 309 U.S. 190 (1940), which in turn relied on *Pottorff* and *Marion*.

[27]12 U.S.C. § 1823(e).

[28]GARRARD GLENN, THE RIGHTS AND REMEDIES OF CREDITORS RESPECTING THEIR DEBTOR'S PROPERTY §§ 322 & 323, at 253 (1915).

[29]GLENN, *supra*, § 323 at 253. Glenn cites some cases where "opinions affirm the right of a chancery receiver as the representative of the creditors, to maintain suits to set aside fraudulent transactions." *Id*. § 326 at 256.

11

the corporation; (3) where the receiver was appointed supplemental to execution and had the rights of the creditors who had executed; and (4) where the receiver was suing for property that belonged to the debtor. Glenn cites an opinion of the Supreme Court of Illinois that arrived at that same conclusion after surveying a great number of cases and ultimately held that receivers generally do not have the power to assert creditors' rights to avoid the debtor's transactions:

> [W]e think the decided weight of authority sustains the rule in respect to the powers of receiver, where there has been no enlargement of their powers by legislative enactment, that they have such rights of action only as were possessed by the persons or corporations upon whose estates they administer. A receiver is the right hand and creature of the court of equity, and he has such powers as are conferred upon him by the order appointing him, and the course and practice of the court. It will hardly be claimed, however, that the court of chancery, even with all its inherent powers, is authorized, in the absence of legislative sanction, to clothe its receiver with power to seize and enforce a property right which belongs only to parties who are not before the court, nor asking its assistance.[30]

After considering some cases and arguments to the contrary, Glenn concludes: "However reason or precedent be raked, no justification can be found for the practice of tolerating suits by chancery receivers to set aside fraudulent transfers."[31]

Twenty-five years later Glenn felt "compelled to admit" that "by majority rule" a receiver does have power to attack a fraudulent conveyance.[32] The only authority he cited for that conclusion was a Yale Law Journal note that concluded: "The majority view, however, seems to permit recovery by the receiver," citing four cases for that authority.[33] But Glenn was not convinced: "This majority idea, however, seems wholly wrong."[34]

**Conclusion**

---

[30]*Republic Life Insurance Co. v. Swigert*, 135 Ill. 150, 173, 25 NE 680 (1890).

[31]Glenn, *supra*, § 329, at 260.

[32]I GARRARD GLENN, FRAUDULENT CONVEYANCES AND PREFERENCES § 103, at 204-05 (Rev. Ed. 1940).

[33]Note, *Suits By Representatives to Set Aside Fraudulent Conveyances*, 45 YALE L.J., 504, 508 (1936).

[34]Glenn, *supra* note 31.

12

Neither Glenn's later admission nor the sparse authorities cited in support of it qualifies as the "long line of decisions and a uniform course of practice in the courts of chancery . . . and defined with some accuracy" that Clark required. And the express statutory provisions vesting such powers in Arizona assignees for benefit of creditors, bankruptcy trustees and the FDIC suggests that was never recognized to be the uniform rule of equity. Thus even if the order appointing a receiver had expressly vested such actions in the Receiver, it does not appear that statutory authority exists to do so pursuant to A.R.S. § 12-1241 and its incorporation of "the principles of equity."

Moreover, even if the order and the statute purported expressly to grant such authority to the receiver, this would raise the constitutional question of whether such state law would violate the Supremacy Clause of the U.S. Constitution. The Ninth Circuit has held that a California statute giving preference avoidance actions to an assignee for benefit of creditors does violate the Supremacy Clause.[35] It would be difficult to distinguish California's vesting of preference avoidance powers in an assignee for benefit of creditors from Arizona's vesting of fraudulent transfer avoidance powers in a receiver, if the Arizona receivership statute were so read. Arizona courts interpret statutes to avoid such constitutional issues when possible.[36]

Rosepink's motion also asserts a statute of limitation defense, in response to which the Receiver asserts the applicable statutes were tolled as of the bankruptcy petition date by virtue of Bankruptcy Code § 108(a). But § 108(a) tolls statutes of limitation only as to trustees and debtors in possession. As noted above, the Receiver did not assert any causes of action in the complaint against Rosepink on the basis of his authority as trustee or debtor in possession, but only on his authority as a Receiver. Rosepink might also therefore be entitled to partial

---

[35] *Sherwood Partners, Inc., v. Lycos, Inc.*, 394 F.3d 1198 (9th Cir. 2005) ("We believe that statutes that give state assignees or trustees avoidance powers beyond those that may be exercised by individual creditors trench too close upon the exercise of the federal bankruptcy power").

[36] *Bentley v. Building our Future*, 217 Ariz. 265, 270 ¶ 11, 172 P.3d 860 (App. Div. 1 2007)("If possible we construe statutes 'to avoid rendering them unconstitutional,' and 'to avoid unnecessary resolution of constitutional issues.'"), quoting *Hayes v. Continental Ins. Co.,* 178 Ariz. 264, 272-73, 872 P.2d 668, 676-77 (1994).

summary judgment as to transfers received more than four years prior to the date of the petition in bankruptcy, pursuant to the Arizona "statute of repose" for fraudulent transfers.[37] This decision need not be reached in light of the disposition of the entire first cause of action, but it is noted here to the extent it may provide guidance as to some of the other remaining 13 causes of action. Similarly, however, it is also unnecessary in light of this decision to consider Rosepink's defenses of good faith and *in pari delicto.*

Because neither Arizona statutes nor case law nor the order appointing receiver vested the Receiver with creditor causes of action, Rosepink is granted partial summary judgment dismissing the Receiver's first fraudulent transfer cause of action.

DATED AND SIGNED ABOVE

Copy of the foregoing e-mailed
this 15th day of April, 2009, to:

Donald F. Ennis, Esq.
Snell & Wilmer L.L.P.
Attorneys for Morris C. Aaron
dfennis@swlaw.com

Timothy J. Thomason, Esq.
Johnathan Batchelor, Esq.
Mariscal, Weeks, McIntyre & Friedlander, P.A.
Attorneys for Defendants
tim.thomason@mwmf.com
johnathan.batchelor@mwmf.com


  /s/ Pat Denk
Judicial Assistant

---

[37] A.R.S. § 44-1009 ("A claim for relief with respect to a fraudulent transfer or obligation under this article is extinguished unless an action is brought" . . . "within four years after the transfer was made," subject to a discovery rule for actual fraudulent transfers).

Case 2:08-ap-00278-RJH    Doc 26    Filed 04/15/09    Entered 04/16/09 11:50:18    Desc
Main Document    Page 14 of 14